INHABITANTS OF PORTLAND *versus* INHABITANTS OF BANGOR.

The overseers of the poor of the city of Portland committed certain persons to the work-house, by a warrant which described them as persons who, being "able of body to work, and not having estate or means otherwise to maintain themselves, refuse or neglect so to do, live a dissolute, vagrant life, and exercise no ordinary calling or lawful business, sufficient to gain an honest livelihood." — *Held*, that the causes alleged in their warrant were sufficient to give the overseers jurisdiction and authorize the commitment.

The proceeding was rather correctional than penal in its nature.

Overseers, being under oath, are presumed to act with integrity until the contrary be shown.

The town where persons, so committed, have their legal settlement, is liable for their support as paupers.

AGREED STATEMENT OF FACTS, from *Nisi Prius*, HOWARD, J., presiding.

This was an action brought to recover for supplies furnished by the plaintiffs to Betsey Brown and her daughter, Almedia Brown, as paupers, alleged to have had their legal settlement in Bangor, at the time the supplies were furnished. The general issue was pleaded and joined. Legal notice and answer were admitted.

It was also admitted that Betsey Brown was once the wife of Timothy Brown, and that he had a settlement in some town other than Bangor, in this State; that, in 1842, a divorce between them was decreed, on her application; that, in 1838, the family were residing in Oldtown, and that they removed to Bangor and there resided till about 1842; that, when the libel for divorce was filed, the husband was in Thomaston; that, after the divorce, the said Betsey returned to Bangor, where she resided more than five years together, without receiving, during that time, any supplies or support as a pauper, from any town. In 1850, or 1851, she came to Portland and remained until the bill charged was incurred. Almedia, her daughter, remained and lived with her mother from the time of her divorce until the bill claimed was incurred. She died in 1854, aged 22 years.

On May 23, 1853, the mother and daughter were arrested

on a warrant, a copy of which appears in the case. Either party may refer to the original warrant and return. Objections to the introduction of the warrant as evidence was seasonably made.

On the day of the arrest the said Betsey and Almedia were committed to the work-house in Portland, as appears by the return of the officer.

It appeared in evidence, that Mrs. Brown hired a house on Green street, in Portland, and occupied it, with her daughter; that, while they resided there, it was reputed to be a house of ill-fame; that it was known to the marshal, police and overseers of the poor, and of the work-house, in the city of Portland, to have that reputation notoriously; and, that, upon information to that effect, it had been visited by the officers before mentioned, several times, to ascertain its character and condition, and there was evidence to show that persons were found there, by them, of both sexes, who made it a resort for prostitution. It was not proved to be a disorderly house otherwise than as stated and indicated by the evidence before mentioned.

On the night of the 23d of May, 1853, before mentioned, the persons named in the warrant, a copy of which follows, were found at the house and were arrested, for the reasons stated in the warrant, on complaint made to the overseers aforesaid; similar complaints having been made to them before the night of the arrest. Evidence of the reputation of the house was seasonably objected to.

The defendants contended that the supposed paupers were in a condition to support themselves, and were not in distress and standing in need of immediate relief, before they were committed to the work-house, and offered evidence tending to establish these facts.

Upon the foregoing evidence, or so much of it as was legally admissible, though objected to, the Court was to render such judgment as the legal rights of the parties required, with power to draw such inferences as a jury might properly draw.

The overseers' warrant of commitment in this case was as follows:—

" To either of the constables of the city of Portland,— Greeting:—

" Whereas, it appears to us, the subscribers, overseers of the poor, and of the work-house, in the city of Portland, that Elizabeth Smith, Jane Davis, Mrs. Brown and daughter, and Peter Allen, now resident in said Portland, are persons able of body to work, and not having estate or means otherwise to maintain themselves, refuse or neglect so to do ; live a dissolute, vagrant life, and exercise no ordinary calling or lawful business sufficient to gain an honest livelihood:—

" You are therefore required, in the name of the State of Maine, to take the said Elizabeth Smith, Jane Davis, Mrs. Brown and daughter, and Peter Allen, and them commit unto the work-house in said Portland; and the master thereof is hereby required to receive them into said house and there employ and govern them according to the rules and orders of the same, until they shall be discharged by order of law.

" Given under our hands, this twenty-third day of May, A. D., one thousand eight hundred and fifty-three.

(Signed,)       " George Pearson,
         " Benj. Larrabee."

Officer's return:—   " City of Portland, May 23, 1853.

" By virtue of the within warrant, I have arrested the within named persons, and them committed to the work-house, as within directed.

(Signed,)    " Seth C. Mason, *Constable of Portland.*
" Fees.   Service, $3,75."

Notice to Bangor:—    " Portland, May 27, 1853.

" Gentlemen,—Betsey Brown, wife of Timothy Brown, and Almedia Brown, their daughter, inhabitants of your town, have now become chargable in this city as paupers. We conceive it necessary to give you this information that you may order their removal, or otherwise provide for them as you may judge expedient. We have charged the expense of their

support, which has already arisen, to your town, and shall continue so to do, so long as we are obliged to furnish them with supplies in our almshouse, at an expense of —— dollars per week.

"We are, gentlemen, with much respect, your most obedient and humble servants.

(Signed,)　"Per order,　"E. Trowbridge, *Secretary of the Board of Overseers of the Poor.*"

"The Gentlemen, Selectmen or Overseers of the Poor of the town of Bangor."

Reply:——　　　　　　　　"Bangor, Aug. 23, 1853.

"To the Overseers of the Poor of the city of Portland.

"Gentlemen,—We acknowledge the receipt of your communication.

"The overseers of the poor of Bangor have not been able to discover any law by which the overseers of the poor of any town or city are authorized, by their own warrant, to commit to the work-house, for an indefinite period, any persons only at the expense of the town or city where such persons make the commitment. Hence, I am directed by the board of overseers of the poor of the city of Bangor, to say, most respectfully, to the overseers of the poor of Portland, that, as Mrs. Betsey Brown and her daughter Almedia were committed to the work-house by their warrant, the expenses of such proceedings are not legally chargable to any other town or city; and, therefore, we have no directions or orders to give respecting them whatever.

"We remain, Gentlemen, respectfully, your obedient servants.　(Signed,)　"Charles Hayward, *Per order of Overseers of the Poor of Bangor.*"

*Samuel Fessenden,* for plaintiffs.

1. The overseers of the poor for committing persons to the work-house, under the statute of 1841, c. 28, § 13, in such commitment act as judicial officers, and not as executive, whose judgment is conclusive upon the subject matter.

2. The persons so committed by virtue of such judgment

and under a warrant of commitment, are to be regarded as paupers, and their support provided for in the same way as that of other persons standing in need of immediate relief.

3. The statute of 1841, c. 28, § 13, providing for the erection and maintenance of houses of correction, and for the confinement therein of the class of idle and disorderly persons enumerated in the first section of the Act, contemplates that they are to be regarded as idle and vicious paupers who are to be brought into habits of regularity, sobriety and industry, by forced labor, and not as convicts to be punished for crimes.

It follows, from the above positions, if correct, that the city of Portland, in the first instance, were bound to furnish the immediate relief and support, and that the city of Bangor, the place of lawful settlement of said paupers, were liable over to the city of Portland for all such expenses, and support. Vol. 1 Mass. Laws, stat. of 1787, c. 54, p. 436; Opinion of S. J. Court of Mass., 1 Met. 572.

From this case it will fully appear, that persons committed as these were, to the house of correction, form a distinct class from those sentenced to the house of correction, instead of the State's prison or county jail, upon conviction of other offences, who are regarded as criminals, and whose support is first to be paid for out of the county treasury, and ultimately, by the laws of Massachusetts, by the Commonwealth, as State paupers, and, in our State, paid out of the county treasury.

The warrant does set out a sufficient cause for the commitment of Mrs. Brown and her daughter, they falling under the class of persons who did not exercise any ordinary calling or lawful business, sufficient to gain an honest livelihood, but, on the contrary, were pursuing a dishonest and criminal course of life.

*Wakefield*, for defendants.

The liability of towns to support paupers, is created by statute; and one town, in order to compel another to pay it for the support of paupers, must avail itself of the provisions, and be limited by the conditions, created and required by statute.

One of the required conditions is, that the person for whose support recovery is sought, should have fallen into distress, and stand in need of immediate relief. R. S., c. 32, § 29.

Mrs. Brown and daughter were not of that class of persons described in the warrant, and liable to be seized and committed. The most that can be said, is, that they kept a house of ill-fame. But the overseers have no authority to arrest and commit persons for keeping houses of ill-fame. If the overseers suspected them of keeping a house of ill-fame, it was their duty to prosecute them. R. S., c. 32, § 28.

But it is said that the act of the overseers in making the commitment, was judicial, and, therefore, not liable to be inquired into.

If this act be a judicial act, it is difficult to say what act is not; because,—

1. The overseers are ministerial, and not judicial officers;—
2. There was no hearing of the parties;—
3. There was no adjudication.

This act is very much like that of a justice issuing a warrant to remove a pauper from the State, which has been held to be ministerial. *Knowles & al.'s case,* 7 Maine, 71.

But, assuming that the supposed paupers were rightfully committed, and were in distress when the supplies were furnished, then the defendants are not liable.

Sec. 20, c. 28, R. S., provides that no town shall be liable for the expenses of any person to said work-house, who may not be sent thither by overseers belonging to such town.

It may be possibly said, that this clause refers to commitments to work-houses erected by two or more towns.

I think it obvious that both sections, 20 and 21, and also section 22, refer to and embrace work-houses belonging to one and to several towns.

If the supposed paupers were rightfully committed, and section 20 does not prohibit the recovery for supplies furnished, still the plaintiffs cannot recover.

Chapter 178, § § 24, 25 and 26, of R. S., authorize towns to erect houses of correction, or appropriate work-houses for

that purpose. Sec. 29 makes the parties liable for charges of supporting paupers, when committed to the county house of correction, also liable to pay for their support when committed to the town house of correction.

Section 10 authorizes a justice of the peace to commit certain persons, which includes those described in the warrant of the overseers.

Section 20, under certain contingencies, makes the town, where the person committed had his settlement, liable for his support.

Hence, had Mrs. Brown and daughter been committed agreeably to the provisions in chapter 178, Bangor would have been liable to pay for their support.

But the overseers not pursuing the provisions of this chapter, the plaintiffs cannot recover, because the statute does not make any provision for such class of cases.

GOODENOW, J. — This is an action brought to recover for supplies furnished by the plaintiffs to one Betsey Brown and her daughter, Almedia Brown, as paupers, alleged to have had their legal settlement in Bangor at the time the supplies were furnished. Legal notice and answer were admitted. The amount and value of the supplies are not controverted.

It was admitted that Betsey Brown was once the wife of Timothy Brown, and that he had a settlement in some town in this State other than Bangor; that in 1842, a divorce between them was decreed, on her application; that in 1838, the family were residing in Oldtown, and that they removed to Bangor, and there resided till about 1842; that when the libel for divorce was filed, the husband was at Thomaston; that after the divorce, the said Betsey returned to Bangor, where she resided more than five successive years, without receiving during that time any supplies or support as a pauper, from any town.

In 1850 or 1851, she came to Portland, and remained until the expenses charged in the bill were incurred. Almedia,

her daughter, remained and lived with her mother, until said expenses were incurred. She died in 1854, aged 22 years.

On May 23, 1853, the mother and daughter were arrested on a warrant, and committed to the work-house in Portland, charged by the overseers of the poor, and of the work-house in said city of Portland, with their being residents in said city of Portland, and being able of body to work, and not having estate or means otherwise to maintain themselves, and of refusing and neglecting to do so, and with living a dissolute, vagrant life, and exercising no ordinary calling or lawful business, sufficient to gain an honest livelihood.

The answer does not deny that the legal settlement of the alleged paupers was, and is, in Bangor. But it, in effect, denies the right of the overseers of the poor of the city of Portland to commit any persons, by their own warrant, to their work-house, for an indefinite period, otherwise than at their own expense.

The overseers, who ordered these alleged paupers committed to the workhouse in Portland, were under oath. It is to be presumed they acted with integrity, until the contrary is shown. The causes alleged in their warrant or order of commitment are such as to give them jurisdiction. R. S., c. 28, § 1. "It was rather a correctional than a penal proceeding." If the alleged paupers were in need, it was a proper mode of furnishing them with the necessary supplies, and undoubtedly the most economical.

The evidence offered by the defendants tends to confirm, rather than confute the statement of the overseers of the work-house of Portland, that Mrs. Brown and her daughter were at the time of their commitment living "a dissolute, vagrant life," exercising "no ordinary calling or lawful business, sufficient to gain an honest livelihood."

We are unable to find any good reason why the defendants should not be defaulted. 1 Met. 572.

*Defendants defaulted.*

TENNEY, C. J., and HATHAWAY and MAY, J. J., concurred. APPLETON, J., did not sit.

RICE, J., gave the following dissenting opinion:—

By § 13, of c. 28, stat. of 1840, it is provided, that any two or more overseers in a town having a work-house, may, by order under their hands, commit to such house the persons described in the first section of the same chapter, to wit:—

1st. All poor and indigent persons that are maintained by or receive alms from the town.

2d. All persons who, being able of body, and not having estate or means otherwise to maintain themselves, refuse or neglect to work.

3d. All persons who live a dissolute and vagrant life, and exercise no ordinary calling, or lawful business, sufficient to gain an honest livelihood.

4th. All such persons as spend their time and property in public houses, to the neglect of their business, or by otherwise mis-spending what they earn, to the impoverishment of themselves, and their families are likely to come to want.

Pauperism works most important changes in the condition of the citizen. Through its influence, he is deprived of the elective franchise, and of the control of his own person. The pauper may be transported from town to town, and place to place, against his will; he loses the control of his family, his children may be taken from him without his consent; he may himself be sent to the work-house, or made the subject of a five years contract, without being personally consulted. In short, the adjudged pauper is subordinated to the will of others, and reduced to a condition but little removed from that of chattel slavery, and until recently, by statute of 1847, c. 12, like the slave, was liable to be sold upon the block of the auctioneer, for service or support.

A condition in life so undesirable, not to say revolting, to all that is manly and ennobling in human character, should not be *established* unnecessarily, nor by doubtful nor precipitate action.

The situation of the pauper, or of such as are, in the words of the statute, "likely to become paupers," is more dependent and unprotected than the decidedly vicious and criminal.

Thus, while rogues, vagabonds and beggars; night-walkers, brawlers, pilferers, common drunkards, fortune-tellers, common pipers, fiddlers and the like, may not be sent to the house of correction, except upon trial before a magistrate and on complaint on oath with a right of appeal, or before the Supreme Judicial Court, and then restrained only for a limited period of time; the persons described in the first section of the 28th chapter may be sent to the work-house, by the overseers thereof, for an indefinite period, without any complaint, trial, or right of appeal. And this unrestrained power is exercised over a class of persons not paupers, nor even *quasi* paupers, but who, it is supposed, are likely to become such.

Without stopping at this time to inquire into the expediency of conferring such powers upon any class of citizens, or whether the statute is not in violation of constitutional provisions, and the rights of the citizen, it is obvious that such anomalous powers can only be exercised in that class of cases which are specially pointed out by the statute. Such an irresponsible tribunal, or body, cannot be permitted to extend its jurisdiction by implication, nor assumption; it must walk within the very letter of the law.

Applying these rules to the case as presented before us, had the overseers of the work-house in Portland any jurisdiction over the persons of Mrs. Brown and her daughter when they issued their warrant for their arrest, and sent them to that work-house? They were committed, as their warrant recites, as being "persons able of body to work, and not having estate or means otherwise to maintain themselves, refuse or neglect to do so; live a dissolute and vagrant life, and exercise no ordinary calling or lawful business sufficient to gain an honest livelihood."

The evidence reported, supports no one of these allegations, but tends to show that these persons kept a house of ill-fame, and, perhaps, satisfactorily establishes that fact. If so, they might have been properly proceeded against on complaint or indictment, for that offence, but not in this manner.

But it is contended that the warrant, and officer's return

thereon, is conclusive in the case. Nothing may be presumed in favor of the jurisdiction of an inferior tribunal. Nothing, surely, can be presumed in favor of a body, assuming to control the persons of citizens, and incarcerate them, who hardly present the form or semblance even of an inferior tribunal. No ; such a body must show that it has jurisdiction, before its acts and decrees can be respected.

It may, however, be contended, that whether the acts of the overseers were lawful or not, is immaterial ; because the alleged paupers were in distress, and stood in need of immediate relief, at the time they were supplied, and the defendant town was notified.

Section 29, c. 32, R. S. of 1840, provides that "the overseers, in their respective towns, shall also provide for the immediate comfort and relief of all persons residing or found therein, not belonging thereto, but having lawful settlements in other towns, when they shall fall into distress and stand in need of immediate relief, and until they shall be removed to the places of their lawful settlements."

To authorize towns to interpose under this provision of the statute, and furnish supplies, with which to charge another town, the alleged pauper must have fallen into distress, and stood in need of immediate relief, and the supplies must have been furnished them, as paupers, in good faith. The law will not permit towns, by their unauthorized acts, to force persons, residing therein, into situations of distress, and then relieve them, as paupers, at the expense of some other town. Such a practice would introduce a new mode for preventing settlement of persons in a town, unknown to the law. It is only that class of persons who fall into distress, in the ordinary course of events, or under the ordinary operation of the law, that this statute contemplates.

There is no evidence in this case that Mrs. Brown or her daughter were in distress, or stood in need of relief, at the time of their arrest, under the warrant of the overseers, or that they would have been in that condition had they not been

thus molested, or in case they had been subjected to the ordinary course of legal proceedings.

If it should be suggested, that the plaintiffs are not responsible for the unauthorized acts of the overseers, and that the alleged paupers were in distress, without fault on the part of the plaintiffs when the supplies were furnished, the answer is, that the acts of the overseers have been adopted and ratified by the city, and they are now clearly bound thereby. The authority cited from 1 Met. 495, does not apply.